IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
COLUMBIA DIVISION

| | | |
|---|---|---|
| JAMES DOMINIC STEVENSON, #556327, | ) ) ) | |
| Petitioner, | ) ) | |
| | ) | NO. 1:22-cv-00021 |
| v. | ) ) | JUDGE CAMPBELL |
| MARTIN FRINK, | ) ) | MAGISTRATE JUDGE HOLMES |
| Respondent. | ) | |

**MEMORANDUM AND ORDER**

Petitioner James Stevenson, who is incarcerated at the Trousdale Turner Correctional Center in Hartsville, Tennessee, has filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his convictions and sentences imposed by the Marshall County Criminal Court for attempted first degree murder and reckless endangerment. (Doc. No. 1). Respondent has filed an Answer (Doc. No. 9), and the deadline for Petitioner to file a Reply has passed, (*see* Doc. No. 6). This Court has jurisdiction pursuant to 28 U.S.C. § 2241(d). Having fully considered the record, the Court finds that Petitioner is not entitled to relief. The petition therefore will be denied, and this action will be dismissed.

**I.   PROCEDURAL HISTORY**

Petitioner was indicted by grand jury on one count of first-degree murder of Dixie Matthews, three counts of aggravated assault of Ms. Matthews, one count of reckless endangerment of Giovanni Matthews involving the use of a deadly weapon, and one count of first-degree murder of an unborn fetus. (Doc. No. 8-1 at PageID# 61−67). The state later dismissed the charge of first-degree murder of an unborn fetus. (*Id.* at PageID# 95, 98). A jury convicted Petitioner on all remaining counts. (*Id.* at PageID# 157−61). The court merged all three convictions

for aggravated assault into the conviction for attempted first-degree murder and sentenced Petitioner to consecutive prison terms of 25 years for attempted first-degree murder and two years for reckless endangerment. (Doc. No. 8-2 at PageID# 213, 217); (Doc. No. 8-7 at PageID# 662).

Petitioner appealed and argued that he was convicted based on insufficient evidence. (Doc. No. 8-10 at PageID# 743−48). The Tennessee Court of Criminal Appeals affirmed. (Doc. No. 8-12); *State v. Stevenson*, No. M2017-01514-CCA-R3-CD, 2019 WL 1375349 (Tenn. Crim. App. Mar. 26, 2019). The Tennessee Supreme Court denied Petitioner permission to appeal. (Doc. No. 8-16).

Petitioner then filed a state postconviction petition, which was later amended by counsel. In the operative amended petition, Petitioner alleged, as relevant here, that trial counsel was ineffective for:

- failing to object to hearsay testimony in the form of text messages between Petitioner and Ms. Matthews;
- failing to obtain cell phone location records;
- failing to request DNA and fingerprint testing;
- failing to investigate an alternative suspect;
- failing to request a continuance after the prosecution introduced certain evidence;
- failing to adequately communicate with Petitioner before trial;
- failing to adequately investigate before trial;
- failing to interview prosecution witnesses;
- failing to cross-examine two prosecution witnesses;
- failing to obtain x-rays and ballistic reports;
- failing to effectively challenge Ms. Matthews' reliability and credibility;
- failing to object to the prosecution's closing argument;

2

- failing to adequately confer with Petitioner regarding trial preparation;

- suggesting a potential plea deal that did not come to fruition;

- failing to request on the record that the trial court act as a 13th juror and independently weigh the evidence;

- failing to discuss with Petitioner the motion for new trial, direct appeal, and application for permission to appeal to the supreme court;

- failing to file and argue a notice of alibi;

- failing to move to dismiss the indictment;

- failing to highlight inconsistencies in testimony between the preliminary hearing and trial;

- failing to question potential defects in the indictment; and

- failing to provide Petitioner an opportunity to listen to a recording of the preliminary hearing before trial.

(Doc. No. 8-17 at PageID# 835−43). He also argued that he was convicted based on insufficient evidence and that the trial court erred as a matter of Tennessee law in admitting certain evidence. (*Id.*). After an evidentiary hearing, the trial court denied the petition. (*Id.* at PageID# 850−77).

On appeal from the denial of postconviction relief, Petitioner argued that trial counsel was ineffective for failing to:

- request DNA testing or obtain a DNA expert;

- obtain cell phone location records or move for an expert to analyze those records;

- interview Ms. Matthews before trial;

- investigate threats to Ms. Matthews made by an unidentified third party; and

- investigate defenses or retain experts.

(Doc. No. 8-19 at PageID# 993−97). The Tennessee Court of Criminal Appeals affirmed. (Doc. No. 8-21); *Stevenson v. State*, No. M2020-00134-CCA-R3-PC, 2021 WL 4316843

3

(Tenn. Crim. App. Sept. 23, 2021). The Tennessee Supreme Court denied permission to appeal. (Doc. No. 8-24).

Petitioner next filed a petition for writ of habeas corpus in this Court. In it, he contends that trial counsel was ineffective for failing to:

1) locate, interview, and subpoena witnesses on November 17, 2015;

2) make proper objection at trial;

3) investigate or hire a private expert to present potentially exculpatory x-rays and ballistic reports;

4) obtain cell phone location records; and

5) request DNA and fingerprint testing;

6) request a pretrial continuance after the prosecution disclosed evidence shortly before trial;

7) adequately interview and cross-examine prosecution witnesses;

8) file and argue a notice of alibi;

9) highlight inconsistencies in testimony between the preliminary hearing and trial related to whether a cell phone was left at the scene;

10) question potential defects on the face of the indictment;

11) object to the introduction of hearsay evidence in the form of texts between Petitioner and Ms. Matthews; and

12) object to unspecified testimony;

13) object to prosecutor's unspecified improper and biased comments;

14) assert the illegal search and seizure of Petitioner's "personals";

15) argue for greater consideration of mitigating circumstances at trial;

16) provide sentencing transcripts;

17) object to mishandling of evidence;

18) object to illegal enhanced sentencing;

19) object to inconsistent and recanted statements used to convict; and

4

20) object to detectives and prosecution "tak[ing] evidence that supports a theory rather than … consider[ing] the facts of the evidence of the crime."

(Doc. No. 1 at PageID# 18−26). Respondent answered, arguing that Petitioner's claims are all either improperly pled, procedurally defaulted, or barred from relitigation under 28 U.S.C. § 2254(d). (Doc. No. 9 at PageID# 1097−1124). Petitioner did not file a reply, and the time to do so has passed. (*See* Doc. No. 6).

## II. SUMMARY OF THE EVIDENCE

### A. Trial Evidence

The Tennessee Court of Criminal Appeals summarized the evidence from Petitioner's jury trial as follows:

> At the April 2017 trial, Dixie Matthews, the victim, testified that she met the defendant in February 2014, and they began a romantic relationship. Ms. Matthews had a son, Giovanni Matthews, from a previous relationship who was born around the same time that Ms. Matthews and the defendant met. Although Ms. Matthews and the defendant lived together for a few months in 2015, Ms. Matthews maintained a separate residence throughout their relationship. She described her relationship with the defendant as "rocky." In March of 2015, Ms. Matthews ceased residing with the defendant, and the City Court of Lewisburg issued an order restraining the defendant from contact with Ms. Matthews; however, Ms. Matthews testified that she and the defendant continued to see each other despite the restraining order until their relationship ended "towards the end of August" 2015.
>
> Ms. Matthews testified that, on August 30, 2015, she was released from jail on bond for "[t]heft of a credit card." She acknowledged that she had since been convicted of the offense and was on probation at the time of the trial. Ms. Matthews stated that the defendant contacted her on September 4, 2015, after he had seen a posting on Facebook in which Ms. Matthews stated that she was pregnant. At the time, Ms. Matthews believed that she was 10 weeks pregnant by a "guy friend" with whom she had had a relationship after March 2015. On September 4, the defendant contacted Ms. Matthews by text message, bringing up her pregnancy. Ms. Matthews did not immediately respond to the defendant's text message but sent a reply text message later that night. The defendant contacted Ms. Matthews again on the morning of September 5 by text message, asking whether he was the father of Ms. Matthew's unborn child. Ms. Matthews testified that she communicated with the defendant via telephone calls and by text messages on September 5.
>
> A series of text messages from September 4 and 5 between Ms. Matthews and the defendant were exhibited to Ms. Matthews' testimony and shown to the jury. Ms.

5

Matthews explained that during the time of those text messages, she was in the process of moving from Lewisburg to Lawrenceburg. During a text message conversation on September 5, Ms. Matthews stated that her "iPhone almost had it[;] it keeps blacking out and [the] spe[a]ker quit working." Later, in that same text message conversation, the defendant asked whether he could "see Giovanni" that night, to which Ms. Matthews responded, "Yea when we get back to [L]ewisburg[.]" At approximately 9:55 p.m., Ms. Matthews and the defendant had the following conversation via text messages:

[Ms. Matthews:] We coming into [L]ewisburg now[.]

[The defendant:] I'll be ready[.]

[Ms. Matthews:] K give us about 5 minutes[.]

[The defendant:] Ok[.]

Ms. Matthews testified that she also had a telephone conversation with the defendant during the same period that they were text messaging each other, and the defendant told her that "he was over at his friend's house" and that she should meet him at the Marshall County Plaza ("the Plaza") located at 1570 Old Columbia Highway.

Ms. Matthews testified that she arrived at the Plaza at approximately 10:15 p.m. on September 5 with Giovanni secured in an infant car seat in the back seat of her vehicle on the passenger's side. When Ms. Matthews arrived at the Plaza, she "pulled in on the side of the building," and the defendant "came outside the bushes and got in [her] passenger seat." Ms. Matthews stated that she could clearly see the defendant's face because the dome light in her vehicle came on when he opened door. The parking lot of the Plaza also had lights that illuminated the area where Ms. Matthews had stopped her vehicle. The defendant then "told Giovanni that this [wa]s the last time" the defendant would see them, and Ms. Matthews recognized the defendant's voice when he spoke. Ms. Matthews testified that the defendant then "hit [her] in the head with a hard object." She began "crying and told him [she] didn't have time to start fighting with him." Ms. Matthews described what happened next: "He just reached behind me still, playing with Giovanni, and that's when I heard the clicking sound." She "happened to glance over and ... noticed that [the defendant] had a gun in his hoodie pocket." Ms. Matthews stated that, prior to this incident, she had never seen the defendant with a handgun. She told the defendant to get out of her vehicle, which the defendant did. The defendant, standing one or two steps away from the vehicle, then aimed the gun at Ms. Matthews and fired, shooting Ms. Matthews in her "lower right jaw." Ms. Matthews began to drive forward, which caused her cellular telephone to fall "underneath [her] foot," so she stopped the car to pick up the phone. At that time, the defendant "ran back over and came through the passenger door and snatched [the] phone" from Ms. Matthews and "ran toward the bushes." The defendant slipped, regained

6

his balance, and fired a second shot, which hit the driver's side window of Ms. Matthews' vehicle.

Ms. Matthews drove away from the scene and stopped at a nearby house where two men were outside. She asked them to call 9-1-1 but inferred that the men did not speak English and could not understand her. She then drove to the police station and honked her car horn, but no one responded. Next, she drove to a tennis court on Jones Circle to find her boyfriend, but he was not there so she asked two other people to call 9-1-1. Ms. Matthews then drove to Marshall County Medical Center ("MCMC"). She was later transported to Vanderbilt Medical Center by helicopter, where she remained for four or five days. Ms. Matthews testified that the bullet fractured her mandible and lodged in the bone, and the doctors were unable to remove all of the bullet fragments for fear of causing greater damage. Ms. Matthews identified with 100 percent certainty that the defendant was the person who shot her.

On cross-examination, Ms. Matthews testified that the telephone she had used to communicate with the defendant was an AT & T iPhone. She agreed that everything she had stated in her text messages to the defendant was true and accurate and that the text messages exhibited to the jury were all of the messages sent between the defendant and her. She estimated that she and the defendant had also communicated by telephone "about three or four times" the night of September 5 and that the defendant had initiated each of those calls. Ms. Matthews acknowledged that, because of her training as a certified nursing assistant, she understood the severity of her injury yet drove to three different locations before going to the emergency room. She explained that she drove to the tennis court to find her boyfriend to watch Giovanni while she sought medical treatment. Despite seeing two friends at the tennis court and asking them to call 9-1-1, she did not ask either of them to accompany her to the hospital. She acknowledged that she knew that she was at risk of passing out if she lost too much blood.

Lewisburg City Police Department Detective Santiago McKlean testified that he responded to a shooting at the Plaza. During his investigation he collected two shell casings, broken glass, and Ms. Matthews' cellular telephone from the scene. He described the parking lot at the Plaza as being illuminated at night. At the location where Ms. Matthews first stopped after the shooting and asked two men to call 9-1-1, Detective McKlean observed "blood on the curb" and "on the sidewalk going toward the yard." Detective McKlean testified that he developed a suspect in the shooting but was not able to locate the suspect that night; he did not locate a weapon that night. Detective McKlean interviewed Ms. Matthews at the Vanderbilt Medical Center Intensive Care Unit the following day.

During cross-examination, Detective McKlean testified that he did not obtain images of a listing of Ms. Matthews' telephone calls from her cellular telephone. He subpoenaed the phone records from AT&T for the defendant's and Ms. Matthews' telephone numbers, but he stated that he had no evidence of

7

telephone calls between the defendant and Ms. Matthews other than Ms. Matthews' statement to that effect.

Tennessee Bureau of Investigation Crime Laboratory Agent Jessica Hudson, an expert in ballistics and cartridge shell casing identification, testified that the two shell casings collected in this case were .25 auto caliber and were fired from the same gun. On cross-examination, she explained that the gun involved in this case had not been previously recorded in the National Integrated Ballistics Information Network, which is a database used for determining "if a particular gun has been used in a different crime."

… The defendant did not testify and did not present any evidence.

On this evidence, the jury convicted the defendant as charged, and the trial court merged the alternative verdicts of aggravated assault into the conviction for attempted first degree murder. Following a sentencing hearing, the trial court sentenced him to an effective sentence of 27 years' incarceration.

(Doc. No. 8-12 at PageID# 770−73).

## B. Postconviction Proceedings

The Tennessee Court of Criminal Appeals summarized the testimony provided at the postconviction hearing as follows:

At the hearing, trial counsel testified that he visited the Petitioner three to five times in jail and met with him on court dates. Trial counsel reviewed the discovery, including the victim's medical records, and he felt adequately prepared for trial. Trial counsel testified that the State's evidence was strong because the victim had clearly suffered a gunshot wound and because she unequivocally identified the Petitioner, with whom she had had a relationship, as the shooter. The Petitioner filed a bar complaint against trial counsel, and trial counsel moved to withdraw prior to trial, but he felt that he maintained a good relationship with the Petitioner during trial.

Trial counsel did not request fingerprint or DNA analysis of the cell phone or the cartridge casings. He testified that the victim's phone had been left in the elements for a period of time after the shooting and that he accordingly believed there was a low chance of finding any DNA on it.

Trial counsel did not recall a search warrant for the Petitioner's cell phone, but he recalled that the proof introduced by the State was actually taken from the victim's cell phone. Trial counsel subpoenaed the records for the Petitioner's cell phone from his cell phone service carrier, but he did not specifically ask for the cell phone locator service records. Trial counsel testified that he had asked the Petitioner about a possible alibi and that the Petitioner had "directed [trial counsel] not to go down

8

that path." The Petitioner never told trial counsel that he was out of the state at the time of the shooting.

Trial counsel testified that the records from the cell phone carrier were not accurate for Central Time Zone because the records indicated time in UTC. Trial counsel attempted to introduce proof regarding the correct times, but the State objected that such proof required expert testimony. Because the court agreed with the State, trial counsel made an offer of proof regarding the evidence.

Trial counsel acknowledged that he had not interviewed the victim prior to trial but noted that he had reviewed the victim's preliminary hearing testimony. He stated that he prepared for trial with the victim's audio recorded testimony and that this source provided the information he needed for the cross-examination of the victim. He tried to cross-examine the victim with inconsistencies between her preliminary and trial testimony, but the State's objections to his questions were sustained. He did not review the preliminary hearing with the Petitioner or have it transcribed.

Trial counsel did not object to the introduction of the text messages from the victim's cell phone because he felt they supported the theory of the defense. The victim testified at trial that she and the Petitioner had phone conversations prior to the shooting, but the text messages reflected that the speaker on her cell phone was not functioning. The text messages never specified a meeting place. Trial counsel asked the victim both if everything contained in the texts was true and if her cell phone was the only phone she used, and she answered in the affirmative to both questions. Trial counsel recalled that Detective McKlean testified that there were no calls between the two cell phones on the date of the offense. Trial counsel's strategy was to cast reasonable doubt on the Petitioner's identity by arguing to the jury that the victim and Petitioner never agreed to a meeting place either by text or by telephone and that the Petitioner, therefore, could not have been the shooter. Trial counsel testified that he avoided further questioning the victim about the broken speaker because he did not want to give the victim an opportunity to provide an explanation regarding how any meeting spot was communicated.

The victim had made a claim around the time of trial that she was pregnant when she was not. Trial counsel stated that it was not clear if this claim was an intentional misrepresentation and that he did not attempt to introduce it at trial. He elaborated that he did not want to impair the credibility of the defense with the jury by attacking a victim who had clearly suffered a serious gunshot wound. Trial counsel did not recall any contradictions in the victim's testimony regarding how she got to the hospital in Nashville.

The victim had stolen a credit card close in time to the shooting. Trial counsel filed a motion to ensure that the evidence would be admissible. However, the State introduced the conviction during its case-in-chief in order to minimize its impact. Trial counsel testified that "a third party" had told the victim that the owner of the stolen credit card was "going to come and get her." He agreed that the victim had "brought up another name of someone sending a threatening message" to her at the

9

preliminary hearing. Trial counsel did not attempt to interview the person who threatened the victim. He tried to introduce the information during cross-examination, but he stated that the trial court sustained an objection to the evidence.

The Petitioner testified that his first attorney quit private practice and that trial counsel advised him to take a twenty-two-year plea offer when they first met. Trial counsel met with the Petitioner three times in jail. The Petitioner complained to the Board of Professional Responsibility about trial counsel and asked trial counsel to withdraw because trial counsel was not communicating with him adequately. Trial counsel did not review the preliminary hearing testimony with the Petitioner.

The Petitioner asked trial counsel about DNA proof, but trial counsel told him that the DNA proof did not matter because the victim had identified the Petitioner. Trial counsel did not obtain DNA testing or ballistics testing. The Petitioner acknowledged on cross-examination that he had been in a relationship with the victim. Asked if it was possible that his DNA had been deposited on the victim's belongings through their acquaintance and if finding such DNA would have been inculpatory, he stated he was unsure.

The Petitioner stated that his first attorney had told him to produce his cell phone so that they could try to use location services to pinpoint his location at the time of the shooting. However, trial counsel never obtained location service records. The Petitioner testified that trial counsel never mentioned the possibility of alibi proof until ten days before trial. He stated he was out of the state on labor day weekend and first heard of the shooting when his mother told him he was accused of shooting "somebody." The Petitioner clarified that he was not out of the state but in Marshall County on the night of the shooting.

According to the Petitioner, the victim's testimony was inconsistent with her preliminary hearing testimony in that she had testified that she was in an ambulance at the preliminary hearing but stated at trial that she was moved via life flight. He stated that he never spoke with the victim on the phone on September 4th or 5th. Instead, the victim was released from jail and came to see him on September 3rd. The Petitioner speculated that the "motive behind" the victim's accusing him of shooting her was that she was angry either that he had a date with another woman on the night of September 3rd or that he denied being the father of her unborn child.

The Petitioner testified that the woman whose credit card was stolen by the victim threatened the victim about thirty to forty-five minutes prior to the shooting. Trial counsel never investigated this threat.

(Doc. No. 8-21 at 1029−32).

# III. STANDARDS OF REVIEW

## A. Procedural Default

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted). "To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court . . ., thereby alerting that court to the federal nature of the claim." *Id.* (citation omitted). In Tennessee, a petitioner is "'deemed to have exhausted all available state remedies for [a] claim'" when the claim is presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 401 (6th Cir. 2003) (quoting Tenn. Sup. Ct. R. 39).

A procedural default can occur in one of two ways. First, a procedural default may occur if the state court actually "relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U. S. 320, 327 (1985). Second, if a petitioner fails to properly exhaust a claim in state court, and the claim can no longer be raised in state proceedings because of a failure to follow state procedure for presenting such a claim, the claim is "technically exhausted" but procedurally defaulted. *Woodford v. Ngo*, 548 U. S. 81, 126 (2006).

A petitioner may obtain merits review of a procedurally defaulted claim by demonstrating "cause and prejudice" for the default. *Sutton v. Carpenter*, 745 F.3d 787, 791 (6th Cir. 2014). To establish cause, the petitioner must show that "some objective factor external to his defense impeded his ability to comply with the state's procedural rule." *Bies v. Sheldon*, 775 F.3d 386, 396 (6th Cir. 2014). In Tennessee and many other states, a petitioner who raises a procedurally defaulted claim alleging ineffective assistance of trial counsel may demonstrate cause by showing

11

that postconviction counsel was ineffective for failing to raise the claim in initial state postconviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 17 (2012) ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."); *Trevino v. Thaler*, 569 U.S. 413, 429 (2013) (extending *Martinez* to states with procedural frameworks that make unlikely a meaningful opportunity to raise ineffective assistance claim on direct appeal); *Sutton*, 745 F.3d at 795−96 (holding that *Martinez* and *Trevino* apply in Tennessee).

As an alternative to the cause-and-prejudice framework, a Petitioner may obtain merits review of defaulted claims by showing that the challenged conviction constitutes a "fundamental miscarriage of justice" by presenting new evidence to show the Petitioner is actually innocent of the offense. *Schlup v. Delo*, 513 U.S. 298, 327 (1995) ("[T]he petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.").

**B. Merits Review**

The petition in this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). The AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (internal citations and quotation marks omitted). One of the AEDPA's most significant limitations on the federal courts' authority to issue writs of habeas corpus is found in 28 U.S.C. § 2254(d). Under this provision, the court may grant a writ of habeas corpus on a claim that was adjudicated on the merits in state court if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under Section 2254(d)(1), a state court's decision is "contrary to" clearly established federal law "'if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision [of the Supreme Court] and nevertheless arrives at a [different result].'" *Hill v. Curtin*, 792 F.3d 670, 676 (6th Cir. 2015) (en banc) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)). "Under the 'unreasonable application' clause of [Section] 2254(d)(1), habeas relief is available if 'the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case.'" *Id.* (quoting *Harris v. Haeberlin*, 526 F.3d 903, 909 (6th Cir. 2008)). A state court's application is not unreasonable under this standard simply because a federal court finds it "incorrect or erroneous"—instead, the federal court must find that the state court's application was "objectively unreasonable." *Id.* (quotation marks omitted). Review under Section 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011).

To clear the bar of Section 2254(d)(2), a petitioner must show that "the state court's factual determination was 'objectively unreasonable' in light of the evidence presented in the state court proceedings." *Young v. Hofbauer*, 52 F. App'x 234, 236 (6th Cir. 2002). State court factual determinations may be found unreasonable only "if it is shown that the state court's presumptively correct factual findings are rebutted by 'clear and convincing evidence' and do not have support

13

in the record." *Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017) (quoting *Matthews v. Ishee*, 486 F.3d 883, 889 (6th Cir. 2007)).

## IV. ANALYSIS

Petitioner identifies 20 alleged instances of counsel's alleged ineffectiveness. Most of them are procedurally defaulted, and Petitioner has not argued any basis for excusing the defaults. The Court addresses each of Petitioner's allegations of trial counsel's ineffectiveness, beginning the defaulted ones and then turning to those that were fully and fairly presented in state court.

### A. Procedurally Defaulted Grounds

Petitioner presented only five bases supporting his ineffective-assistance-of-trial-counsel arguments in the Tennessee Court of Criminal Appeals on postconviction appeal. (Doc. No. 8-19 at PageID# 993−97) (arguing that trial counsel was ineffective for failing to request DNA testing or obtain a DNA expert, obtain cell phone location records or move for an expert to analyze those records, interview Ms. Matthews before trial, and investigate threats to Ms. Matthews made by a third party). All other grounds that he brings in this Court are therefore procedurally defaulted. *Adams*, 330 F.3d at 401; Tenn. Sup. Ct. R. 39.

Petitioner does not argue cause and prejudice to excuse his defaults. (*See generally* Doc. No. 1). Nor has he presented any new evidence from which the Court could make a finding of actual innocence. Accordingly, the ineffective-assistance-of-trial-counsel claims that were not presented to the Tennessee Court of Criminal Appeals on postconviction review will be denied based on procedural default.

### B. Non-Defaulted Grounds

As noted above, Petitioner fairly presented four grounds of ineffective assistance of trial counsel to the Tennessee Court of Criminal Appeals. Reading the petition in the light most

14

favorable to Petitioner, he presents three of those grounds in this Court: (1) failure to request DNA testing and obtain a DNA expert; (2) failure to obtain cell phone location records or an expert to analyze them; and (3) failing to interview Ms. Matthews before trial. The Tennessee Court of Criminal Appeals adjudicated them each on the merits, so 28 U.S.C. § 2254(d) governs this Court's review.

The Sixth Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment, guarantees the right of a person accused of a crime to the effective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a petitioner must show (1) deficient performance of counsel and (2) prejudice to the defendant. *See Bell v. Cone*, 535 U.S. 685, 694−95 (2002). Trial counsel's performance is deficient when it falls below an objective standard of reasonableness. *See Strickland v. Washington*, 466 U.S. 668, 686−87 (1984). The prejudice element requires a petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

As discussed above, federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law as clearly established at the time in the holding(s) of the United States Supreme Court, "involved an unreasonable application of" such law, or "was based on an unreasonable determination of the facts" in light of the record before the state court. 28 U.S.C. § 2254(d)(1), (2). Thus, where (as here) a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is not whether the petitioner's counsel was ineffective. Instead,

"[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

1. Failure to request DNA testing and obtain DNA expert

Petitioner contends that trial counsel was ineffective for failing to request DNA testing and obtain an expert to testify to the results. (Doc. No. 1 at PageID# 20). The Tennessee Court of Criminal Appeals rejected this argument on prejudice grounds because Petitioner had not "adduced any evidence regarding what DNA testing would have shown or what testimony an expert in DNA analysis would have given." (*See* Doc. No. 8-21 at PageID# 1034). This was a reasonable determination of fact and reasonable application of *Strickland*'s prejudice prong. *See Tinsley v. Million*, 399 F.3d 796, 810 (6th Cir. 2005) ("In the absence of any evidence showing that [proposed witnesses] would have offered specific favorable testimony, [a petitioner] cannot show prejudice from counsel's strategy recommendation not to introduce this evidence."). Accordingly, 28 U.S.C. § 2254(d) bars relief as to this ground.

2. Failure to obtain cell phone location records or an expert to analyze them

Petitioner contends that trial counsel was ineffective for failing to obtain cell phone location records and obtain an expert to testify to the results. (Doc. No. 1 at PageID# 20). The Tennessee Court of Criminal Appeals rejected this argument on prejudice grounds because Petitioner had not "presented any testimony at the post-conviction hearing to demonstrate what the cell phone location records would have shown" and had "presented no witnesses to establish what the expert testimony on time zones would have been, and . . articulated no way in which the time zone evidence affected the verdict." (Doc. No. 8-21 at PageID# 1034−35). This was a reasonable determination of fact and reasonable application of *Strickland*'s prejudice prong. *See Tinsley*, 399 F.3d at 810. Accordingly, 28 U.S.C. § 2254(d) bars relief as to this ground.

### 3. Failure to interview Ms. Matthews

Petitioner contends that trial counsel was ineffective for failing to interview Ms. Matthews before trial. (Doc. No. 1 at PageID# 21). The Tennessee Court of Criminal Appeals held that Petitioner had not demonstrated deficient performance or prejudice because counsel reviewed Ms. Matthews' preliminary hearing testimony and Petitioner had not "articulate[d] how an interview with the victim prior to trial would have affected the outcome of the proceedings." (Doc. No. 8-21 at PageID# 1035). This was a reasonable application of *Strickland*'s prejudice prong. *Cf. United States v. Lester*, 98 F.4th 768, 778 (6th Cir. 2024) (no showing of prejudice from Evidence Rule 404(b)(3)(A) violation, as required on plain-error review, where defendant did not "argue that he could have unearthed new evidence to impeach [the witness], or articulate new questions he would've asked her on cross-examination"). Accordingly, 28 U.S.C. § 2254(d) bars relief as to this ground.

In summary, the Tennessee Court of Criminal Appeals reasonably held that Petitioner had failed to demonstrate prejudice as to any of his non-defaulted grounds alleging ineffective assistance of trial counsel. He is therefore not entitled to habeas corpus relief. 28 U.S.C. § 2254(d).

## V. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal of the denial of a habeas corpus petition may not proceed unless a certificate of appealability (COA) is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing § 2254 Cases requires that a district court issue or deny a COA when it enters a final order. A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are

17

Case 1:22-cv-00021    Document 10    Filed 05/02/25    Page 17 of 18 PageID #: 1142

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). The district court must either issue a COA indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b).

Here, because jurists of reason would not disagree with the resolution of Petitioner's claims, the Court will deny a certificate of appealability. However, Petitioner may seek a certificate of appealability from the Sixth Circuit.

## VI. CONCLUSION

As discussed above, the petition for writ of habeas corpus is **DENIED**, and this action is **DISMISSED** with prejudice. A certificate of appealability will not be granted in this Court, but Petitioner may seek one in the Sixth Circuit.

It is so **ORDERED.**

_____
WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE